

# IN THE
# TENTH COURT OF APPEALS

### No. 10-21-00083-CV

**DON MICHAEL HIGGINS AND JANET HIGGINS,**

**Appellants**

**v.**

**CHARLES H. CROWELL, TERESA H. CROWELL, AND
CAMP CREEK WATER COMPANY,**

**Appellees**

**From the 82nd District Court
Robertson County, Texas
Trial Court No. 19-04-20784-CV**

## MEMORANDUM OPINION

In four issues, Don Michael Higgins and Janet Higgins appeal from the trial court's

judgment signed on March 15, 2021.

### Factual and Procedural Background

The Higginses sued Charles H. Crowell, Teresa H. Crowell, and Camp Creek

Water Company (CCWC), alleging as follows in their original petition: In 1983, the

Higginses purchased Lots 340 and 341 at Camp Creek Lake. Lot 341 had a boathouse.[1] The Higginses still use the boathouse today, and it has always complied with CCWC's building guidelines. Lot 340 has no boathouse.

The Higginses alleged that in 2016, the Crowells purchased Lot 339 at Camp Creek Lake. Lot 339 is located across the cove from the Higginses' lots. When the Crowells purchased Lot 339, it had no boathouse, but the Crowells wanted to build one. The water directly in front of Lot 339 was not suitable for boat traffic or swimming, so the Crowells applied to CCWC for approval to construct a boathouse that would be located directly perpendicular to the Higginses' boathouse. CCWC approved the Crowells' application even though the proposed construction violated CCWC's building guidelines, which prevented any boathouse from extending more than one-third of the distance of the width of a cove and from encroaching on projected property lines.

The Higginses alleged that the Crowells thereafter constructed their boathouse but that after it was complete, the Higginses realized that the Crowells' boathouse was "drastically close" to their own boathouse. The Higginses observed that the Crowells' boathouse almost completely blocked water access to Lot 340 and was a danger and nuisance to the use and enjoyment of their boathouse because the Crowells' boathouse funneled boat traffic close to their boathouse. Mr. Higgins therefore met with two members of CCWC's Building Committee. During the meeting, while standing on the

---

[1] In this opinion, the terms "boathouse" and "boat dock" are used interchangeably.

Higginses' dock, one of the members stated that "[the Crowells' boathouse] is not in the approved location." The member then showed Mr. Higgins the approved location.

The Higginses alleged in their petition that because Mr. Higgins was concerned about the report from CCWC's Building Committee, Mr. Higgins then began pursuing a resolution to the situation. In May 2018, Mr. Higgins appeared before CCWC's Board of Directors to protest the location of the Crowells' boathouse, but CCWC offered no resolution. Mr. Higgins engaged legal counsel to offer a legal opinion regarding the situation, and in June 2018, Mr. Higgins forwarded that legal opinion to the president and director of CCWC, "along with a cover letter reiterating the Higginses' requests and asking for a meeting to amicably resolve the dispute." Around the same time, Mr. Higgins sent a letter to Mr. Crowell explaining the "nuisance and negative effects" to the Higginses' property caused by the location of the Crowells' boathouse. Mr. Higgins asked in the letter for "any suggestions that can accomplish [resolution] with minimal pain and expense to either side." In late July 2018, Mr. Higgins then sent another letter to the president and director of CCWC "summarizing the offending boat house situation and reiterating his request for resolution." In the letter, Mr. Higgins again asked for a personal meeting with the president of the board and the chairperson of the building committee. CCWC did nothing. Around the same time, Mr. Higgins also sent another letter to the Crowells, but it was not accepted.

The Higginses alleged that Mr. Crowell eventually sent an email to Mr. Higgins in August 2018. In the email, Mr. Crowell "justif[ied] the location of his boat house by saying that the water in front of his lot was not desirable." Mr. Crowell further stated

that he had "no incentive to seek any alternative location" but that if Mr. Higgins was willing to pay $76,456, Mr. Crowell would "explore the possibility of constructing a new dock in a location more closely situated to the shoreline in front of [his] lot."

The Higginses alleged in their petition that in September 2018, Mr. Higgins finally delivered to CCWC's office aerial pictures of the water in front of Lots 340 and 341, other pictures showing congested ingress and egress into Lots 340 and 341, and an explanation of the problem with the location of the Crowells' boathouse. During the CCWC board meeting on September 22, 2018, a copy of the pictures and explanation from Mr. Higgins was left for each board member. The board secretary thereafter called Mr. Higgins, however, and told him that CCWC's Board of Directors had concluded that "nothing new had been presented to them regarding the boathouse dispute."

The Higginses therefore filed the present lawsuit for nuisance and negligence. The Crowells and CCWC answered the Higginses' petition by generally denying all the Higginses' allegations. The Crowells then filed a motion to dismiss the Higginses' claims under the version of the Texas Citizens Participation Act (TCPA) in effect at that time.[2] After a hearing, the trial court dismissed the Higginses' claims against the Crowells under the TCPA and ordered the Higginses to pay $7,000 in attorney's fees and $10 in sanctions to the Crowells.

---

[2] The TCPA was substantially amended in 2019, but the 2019 amendments apply only to actions filed on or after September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 11–12. The underlying claims against the Crowells were filed in April 2019; thus, the 2019 amendments to the TCPA do not apply in this case, and our discussion of the TCPA in this opinion is of the version of the TCPA in effect before September 1, 2019. *See id.*

Thereafter, CCWC filed a combined traditional and no-evidence motion for summary judgment against the Higginses. The Higginses then amended their petition and added a shareholder's derivative action against CCWC. CCWC then filed a motion to dismiss the derivative action pursuant to section 21.558 of the Texas Business Organizations Code.

The trial court held a hearing. The trial court then signed a final judgment granting CCWC's motion for summary judgment and its motion to dismiss. The trial court ordered that the Higginses take nothing against CCWC by way of their claims for nuisance and negligence. The trial court also ordered that the derivative action against CCWC was dismissed pursuant to section 21.558 of the Business Organizations Code.

### Issues

The Higginses present the following four issues in this appeal:

1. The trial court erred in granting the Crowells' TCPA motion to dismiss because the TCPA does not apply to the Higginses' claims.

2. The trial court erred in granting the Crowells attorneys' fees and sanctions because the TCPA does not apply to the Higginses' claims.

3. The trial court erred in granting CCWC's motion for summary judgment because fact issues exist on whether CCWC intentionally or negligently created a nuisance, causing the Higginses damages.

4. The trial court erred in dismissing the Higginses' derivative claims against CCWC under Chapter 21 of the Business Organizations Code given the complete lack of evidence supporting the motion.

**The Crowells' TCPA Motion to Dismiss**

We begin with the Higginses' first issue in which they contend that the trial court erred in granting the Crowells' TCPA motion to dismiss.

STANDARD OF REVIEW

We review a trial court's ruling on a TCPA motion to dismiss *de novo*. *Martin v. Walker*, 606 S.W.3d 565, 567 (Tex. App.—Waco 2020, pet. denied); *Holcomb v. Waller County*, 546 S.W.3d 833, 839 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). In reviewing the trial court's ruling, we "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, sec. 27.006(a) (amended 2019) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a)). "We view the pleadings and evidence in the light most favorable to the nonmovant." *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 603 (Tex. App.—San Antonio 2018, pet. denied).

DISCUSSION

"[T]he . . . TCPA protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (citing House Comm. on Judiciary & Civ. Juris., Bill Analysis, Tex. H.B. 2973, 82d Leg., R.S. (2011)). The TCPA establishes a three-step process for the expedited dismissal of such actions. *See Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 691 (Tex. 2018) (per curiam). As a threshold matter, the moving party must show by a preponderance of the evidence that the TCPA properly applies to the "legal action" against it. *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018); *see* Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2,

sec. 27.005(b) (amended 2019) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)). A "legal action" is defined as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, sec. 27.001(6) (amended 2019) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6)). If the moving party meets the initial burden of showing by a preponderance of the evidence that the TCPA properly applies to the legal action against it, the nonmoving party must then establish by clear and specific evidence a *prima facie* case for each essential element of its claims against the moving party. *Youngkin*, 546 S.W.3d at 679; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). If the nonmoving party satisfies that requirement, the burden finally shifts back to the moving party to prove by a preponderance of the evidence each essential element of any valid defenses to the nonmoving party's claims. *Youngkin*, 546 S.W.3d at 679–80; *see* Act of May 24, 2013, 83d Leg., R.S., ch. 1042, § 2 (amended 2019) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d)).

The Higginses' argument focuses on the first step of the process. The Higginses claim that the Crowells failed to show by a preponderance of the evidence that the TCPA applies to the Higginses' claims against the Crowells.

Under the version of the TCPA that governs this case, a party may invoke the TCPA dismissal procedure if the party shows by a preponderance of the evidence that the legal action against it "is based on, relates to, or is in response to [the] party's exercise of the right of free speech, right to petition, or right of association." Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, sec. 27.003(a) (amended 2019) (current version at TEX. CIV.

PRAC. & REM. CODE ANN. § 27.003(a)); *see Youngkin*, 546 S.W.3d at 680.  The exercise of the right of free speech, the exercise of the right to petition, and the exercise of the right of association, as defined by the TCPA, all require a "communication."[3]  *See id.*; TEX. CIV.

---

[3]      Under the TCPA, the "exercise of the right of free speech" means "a communication made in connection with a matter of public concern."  TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3).  The "exercise of the right to petition" means any of the following:

(A)    a communication in or pertaining to:

   (i)      a judicial proceeding;

   (ii)     an official proceeding, other than a judicial proceeding, to administer the law;

   (iii)    an executive or other proceeding before a department of the state or federal government or a subdivision of the state or federal government;

   (iv)    a legislative proceeding, including a proceeding of a legislative committee;

   (v)     a proceeding before an entity that requires by rule that public notice be given before proceedings of that entity;

   (vi)    a proceeding in or before a managing board of an educational or eleemosynary institution supported directly or indirectly from public revenue;

   (vii)   a proceeding of the governing body of any political subdivision of this state;

   (viii)  a report of or debate and statements made in a proceeding described by Subparagraph (iii), (iv), (v), (vi), or (vii); or

   (ix)    a public meeting dealing with a public purpose, including statements and discussions at the meeting or other matters of public concern occurring at the meeting;

(B)    a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;

(C)    a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;

(D)    a communication reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding; and

PRAC. & REM. CODE ANN. § 27.001(3), (4). Thus, to invoke the TCPA dismissal procedure, a party must show by a preponderance of the evidence that the legal action against it is based on, relates to, or is in response to a communication by that party. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (4); Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, secs. 27.001(2), 27.003(a) (amended 2019). When a legal action does not allege a communication, and is instead based on a party's conduct, the TCPA is not implicated. *Allied Orion Grp., LLC v. Pitre*, No. 14-19-00681-CV, 2021 WL 2154065, at *3–4 (Tex. App.— Houston [14th Dist.] May 27, 2021, no pet.) (mem. op.); *Pacheco v. Rodriguez*, 600 S.W.3d 401, 410 (Tex. App.—El Paso 2020, no pet.).

In their TCPA motion to dismiss and in their appellate briefing, the Crowells assert that the Higginses' petition alleged that the Crowells created a nuisance by applying to build a boathouse in a place on Camp Creek Lake that offended the Higginses. The Crowells then focus on the communications that necessarily occurred in the process of obtaining CCWC's approval to build the boathouse. *See generally* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1) (broadly defining "communication" as "the making or submitting of a statement or document in any form or medium, including oral, visual, written,

---

(E)      any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state.

*Id.* § 27.001(4). The "exercise of the right of association" means "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, sec. 27.001(2) (amended 2019) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2)).

audiovisual, or electronic"). For instance, the Crowells state that they were "required to communicate to the CCWC the exact plans and location for the boat dock."

The Higginses assert, however, that the Crowells have mischaracterized their claims. The Higginses contend that their claims against the Crowells are not based on, do not relate to, and are not in response to the Crowells' *application* to build a boathouse or any other communication by the Crowells but that their claims are instead based on the Crowells' *conduct* of building a boathouse in a manner that interfered with the Higginses' property rights. We agree. While the Higginses' petition does reference as a background fact the Crowells' application to build a boathouse, the Higginses' claims against the Crowells are not based on, do not relate to, and are not in response to the Crowells' application. Instead, the Higginses alleged in their petition that they suffered damages because of the Crowells' conduct in building a boathouse in a manner that interfered with the Higginses' property rights.

The Crowells therefore failed to show by a preponderance of the evidence that the TCPA applies to the Higginses' claims against them. *See Allied Orion Grp.*, 2021 WL 2154065, at *3–4; *Pacheco*, 600 S.W.3d at 410. Accordingly, the trial court erred in granting the Crowells' TCPA motion to dismiss. *See* Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, sec. 27.005(b) (amended 2019). We sustain the Higginses' first issue.

## Attorneys' Fees & Sanctions Under TCPA

In their second issue, the Higginses contend that the trial court erred in granting the Crowells attorneys' fees and sanctions because the TCPA does not apply to the Higginses' claims.

Under the version of the TCPA that governs this case,

> [i]f the court orders dismissal of a legal action under this chapter, the court shall award to the moving party:
>
> (1)  court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and
>
> (2)  sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.

Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, sec. 27.009(a) (amended 2019) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)).

Having held that the trial court erred in granting the Crowells' TCPA motion to dismiss, we hold that the Crowells are therefore not entitled to attorneys' fees under the TCPA, and the sanctions award is not authorized.  *See id.*; *City of Port Aransas v. Shodrok*, No. 13-18-00011-CV, 2019 WL 6205466, at *5 (Tex. App.—Corpus Christi–Edinburg Nov. 21, 2019, no pet.) (mem. op.).  We sustain the Higginses' second issue.

## CCWC's Motion for Summary Judgment

In their third issue, the Higginses contend that the trial court erred in granting CCWC's motion for summary judgment on the Higginses' nonderivative claims because fact issues exist regarding whether CCWC intentionally or negligently created a nuisance, causing the Higginses damages.

STANDARD OF REVIEW

We review a trial court's summary judgment, both traditional and no-evidence, *de novo.  Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Strandberg*

*v. Spectrum Office Bldg.*, 293 S.W.3d 736, 738 (Tex. App.—San Antonio 2009, no pet.).

When a party moves for both traditional and no-evidence summary judgments, we first

consider the no-evidence motion. *First United Pentecostal Church of Beaumont v. Parker*, 514

S.W.3d 214, 219 (Tex. 2017). Any claims that survive the no-evidence review are then

reviewed under the traditional standard. *Id.* at 219–20.

NO-EVIDENCE SUMMARY JUDGMENT

A no-evidence motion for summary judgment is essentially a motion for pretrial

directed verdict. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex. 2006); *see Humphrey

v. Pelican Isle Owners Ass'n*, 238 S.W.3d 811, 813 (Tex. App.—Waco 2007, no pet.). Once

such a motion is filed, the burden shifts to the nonmoving party to present evidence

raising an issue of material fact as to the elements specified in the motion. *Tamez*, 206

S.W.3d at 582. The nonmovant must produce "summary judgment evidence raising a

genuine issue of material fact." TEX. R. CIV. P. 166a(i). A genuine issue of material fact

exists if more than a scintilla of evidence establishing the existence of the challenged

element is produced. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More

than a scintilla of evidence exists when the evidence "'rises to a level that would enable

reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *Merrell

Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). On the other hand, the

evidence is no more than a scintilla if it is "so weak as to do no more than create a mere

surmise or suspicion." *Id.* When determining if more than a scintilla of evidence has

been produced, the evidence must be viewed in the light most favorable to the

nonmovant. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

Here, the Higginses' nonderivative claims against CCWC were based on nuisance theories. "A 'nuisance' is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 593–94 (Tex. 2016) (quoting *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003)). The term "nuisance" refers not to a cause of action or to a defendant's conduct but to the legal injury that may give rise to a cause of action. *Id.* at 594. A defendant can be liable for causing a nuisance if the defendant intentionally causes it, negligently causes it, or—in limited circumstances—causes it by engaging in abnormally dangerous or ultra-hazardous activities. *Id.* at 588.

The Higginses alleged that CCWC intentionally and/or negligently caused a nuisance that then caused the Higgenses damages. In the no-evidence portion of its motion for summary judgment, CCWC then challenged whether there was any evidence of the following: (1) the Higginses had a real property interest with which CCWC interfered; (2) CCWC acted intentionally or negligently; and (3) CCWC proximately caused an injury to the Higginses' real property interest. The Higginses thereafter produced the following relevant evidence in response to CCWC's motion for summary judgment.

The Higginses first submitted the affidavit of Mr. Higgins as evidence in response to CCWC's motion for summary judgment. In his affidavit, Mr. Higgins stated as follows: He and his wife own Lots 340 and 341 at Camp Creek Lake, and Lot 341 has a boat dock.

When they bought the lots, the Higginses also purchased a share of stock in CCWC. Additionally, Mr. Higgins pays a "use fee" annually for the use of Camp Creek Lake.

Mr. Higgins stated that all CCWC stockholders are provided a copy of the rules and regulations for use of Camp Creek Lake. Mr. Higgins attached a copy of those rules and regulations to his affidavit. The attachments include copies of the "Rules and Regulations for CCWC Property and Facilities," the "[CCWC] Building Permit Application," and the 2019 "Application for [CCWC] Annual Use Fee."

First, the "Rules and Regulations for CCWC Property and Facilities" provide in relevant part:

**7[.] Improvements and Alterations on CCWC Property**

7.1 Lot Owners desiring to make **ANY** improvements on or alterations of CCWC property for any purpose, must first submit a Building Permit application for authorization to use CCWC property, in duplicate, with attached lot survey, accurate site plan and photos of the site, to the Secretary-Treasurer.

. . . .

7.8 The Lot Owner also agrees to remove or pay the cost of removal of any granted improvements when ordered to do so by the CCWC Board of Directors.

. . . .

7.10 The Board of Directors for CCWC reserves the right to revoke these permits at any time.

. . . .

7.13 If improvements include septic systems, buildings, fences, propane tanks or private boat ramps, the permit must be approved by the Building Committee and Board of Directors.

. . . .

**14. Violations**

14.1 Any person violating any of these Rules and Regulations shall be subject to penalties by the Board of Directors which may include:
a. Fines, suspension, or cancellation of Annual Permit privileges.
b. Being barred from going on CCL or any property of CCWC.
c. Filing of trespassing charges.
d. Penalties against guests will be levied against responsible Lot Owner.

. . . .

**16. Rules and Regulations**

16.1 The Rules and Regulations may be changed or amended at any time at the discretion of the Board of Directors.

Next, the "[CCWC] Building Permit Application" contains a list of "Agreement Conditions." The "Agreement Conditions" include: "This application must be submitted to the Secretary/Treasurer and approved by the building committee before any work can begin. Please allow up to 30 days for review and approval. **The project cannot start until there is an approved application on file.**" The "Agreement Conditions" further provide: "Upon notification by the Board of Directors, the **lot owner agrees to repair or remove any structure or facility considered to be undesirable or hazardous.**" Finally, both the "[CCWC] Building Permit Application" and the 2019 "Application for [CCWC] Annual Use Fee" require an applicant to acknowledge and agree that "any existing, or future structure(s) placed upon CCWC property is the personal/private property of the lot owner" and that "all taxes incurred on the structure(s) as well as up-keep, are the responsibility of the lot owner."

Mr. Higgins indicated in his affidavit that when Mr. Crowell decided to build a boat dock on Camp Creek Lake, he followed CCWC's rules and regulations by submitting an application to be approved by CCWC's Building Committee and Board of Directors. Mr. Higgins explained in his affidavit that when Mr. Crowell was working with CCWC's Board of Directors on his application, Mr. Higgins allowed one of CCWC's board members onto his boat dock so that the board member could visually see the location where CCWC's Board of Directors would be granting permission for Mr. Crowell to build his boat dock. Mr. Higgins stated that it became clear once construction of Mr. Crowell's boat dock was completed, however, that Mr. Crowell's boat dock was not built on the location approved by CCWC's Board of Directors and was not built in compliance with CCWC's published rules, regulations, guidelines, and bylaws. Furthermore, Mr. Higgins asserted that because of its location, Mr. Crowell's boat dock is a safety hazard for use of any boat dock that might be built on Lot 340 and for use of Mr. Higgins's existing boat dock on Lot 341. Mr. Higgins stated that Mr. Crowell's boat dock "prevents [Mr. Higgins] or any purchasers from [Mr. Higgins from] being able to build a dock on [L]ot 340 that will allow access to the lake using the cove channel to the lake as a whole."

Mr. Higgins stated in his affidavit that he personally informed CCWC's Board of Directors about the situation regarding Mr. Crowell's boat dock and that two board members subsequently came out to his property to view Mr. Crowell's boat dock. Mr. Higgins stated that the two board members admitted at that time that the Crowells' boat dock had not been built in the location approved by CCWC's Board of Directors. Mr. Higgins asserted in his affidavit that CCWC's Board of Directors have nevertheless been

unwilling to have Mr. Crowell remove his boat dock. Moreover, Mr. Higgins stated in his affidavit that because Mr. Crowell's boat dock blocks Lot 340 from lake access, the Robertson County Appraisal District has reduced Mr. Higgins's taxable value on Lot 340 by approximately twenty-five percent.

The Higginses also submitted the minutes from a May 12, 2018 meeting of CCWC's Board of Directors as evidence in response to CCWC's motion for summary judgment. The minutes show that Mr. Higgins was present at the May 12, 2018 meeting and that he addressed CCWC's Board of Directors at that time. Mr. Higgins told CCWC's Board of Directors that he was concerned that Mr. Crowell had been allowed to construct a new boathouse so close to his own boathouse. Mr. Higgins stated that Mr. Crowell's boathouse was only about fifty feet away from his own boathouse. Mr. Higgins further explained that Mr. Crowell's boathouse posed safety concerns because Mr. Higgins has several young grandchildren who swim in the path where Mr. Crowell will have to back out his boat to get out into the channel. Mr. Higgins specified that Mr. Crowell will get extremely close to the deck of Mr. Higgins's boathouse where the children swim.

The meeting minutes show that during the report by the Building Committee, the board members then discussed Mr. Higgins's concerns about Mr. Crowell's boathouse. The minutes indicate as follows: Director Libby Stone first explained to the other board members that Mr. Crowell, the owner of Lot 339, had submitted his boathouse construction plan the way that he had because Mr. Crowell had wanted to situate his boathouse where he would have the deepest water. Director Stone went on to state that the board members had not observed an issue with the proposed location of Mr.

Crowell's boathouse at that time and had therefore approved Mr. Crowell's application to build his boathouse in the proposed location. Director Stone explained that after being notified by Mr. Higgins, however, she and another board member went out to the property and realized that the contractor had built Mr. Crowell's boathouse in the wrong location.

The meeting minutes reflect that after Director Stone provided the foregoing background information, another board member asserted that it sounded like Mr. Higgins has been by himself in the cove for many years and that he just does not like that when he now comes to the lake, there is a new boathouse directly next to his boathouse. Director Stone agreed, and additional discussion resulted in a consensus by the board members that Mr. Higgins was just unhappy that there was now a boathouse next to his boathouse after so many years of having nothing around his boathouse.

The meeting minutes indicate that Vice President David Dixon then added that there was no easy solution to this problem. Vice President Dixon commented that making Mr. Crowell relocate his boat slip was not a reasonable solution because it would be expensive. Another board member also later stated that "this will be a huge expense to change this." President Finley Poe further commented that if they tried to require Mr. Crowell to move his boat slip at this point, they would also likely incur legal expenses. Vice President Dixon then remarked that he thought that Mr. Higgins could learn to live with the situation.

The meeting minutes reflect that a few board members then expressed concern that they were not being consistent in these types of situations. The board members noted

that in another instance when a lot owner had "not followed the rules," the Board of Directors had required the lot owner to correct his boathouse roof. President Poe expressed that they did need to be consistent. Vice President Dixon then added that the builder of Mr. Crowell's boathouse may have encountered stumps that prevented him from building where he intended. Director Stone agreed, stating that that does happen.

The meeting minutes show that "[w]ith no end in sight to the discussion," Vice President Dixon then made a motion, which was seconded by another board member, to leave Mr. Crowell's boathouse where it is. The motion passed. The minutes reflect that discussion among the board members then focused on implementing a follow-up process. Director Stone stated that she would contact Mr. Crowell, inform him that a compliance issue had been brought before the board, and provide him the details and the board's decision.

### 1. The Higginses' Interest in the Land

We begin by addressing whether the Higginses produced evidence raising a genuine issue of material fact regarding the first element that CCWC challenged in the no-evidence portion of its motion for summary judgment—whether the Higginses had a sufficient interest in the land of which CCWC interfered with the use and enjoyment.

Actionable nuisance involves an invasion of another's interests in land. *Hot Rod Hill Motor Park v. Triolo*, 293 S.W.3d 788, 790 (Tex. App.—Waco 2009, pet. denied). Thus, to prove an action for private nuisance, a plaintiff must establish that it had an interest in the land of which the defendant interfered with the use and enjoyment. *See id.* at 790–91; *Lederman v. Cunningham*, 283 S.W.2d 108, 111 (Tex. App.—Beaumont 1955, no writ). To

show such an interest in the land, a plaintiff is not required to show that it possessed legal title to the land. *Triolo*, 293 S.W.3d at 790–91; *see New v. Khojal*, No. 04-98-00768-CV, 1999 WL 675448, at *2–3 (Tex. App.—San Antonio Aug. 31, 1999, no pet.) (not designated for publication). An occupancy interest in the land is sufficient to vest a person with the right to assert a claim for private nuisance if the person occupied the land with intent to control it. *Triolo*, 293 S.W.3d at 791; *see New*, 1999 WL 675448, at *2–3.

The Higginses contend that they produced evidence raising a fact issue regarding whether they had a sufficient interest in the land of which CCWC interfered with the use and enjoyment. CCWC responds that the evidence did not raise a fact issue regarding this element because even though the evidence showed that the Higginses own an interest in Lots 340 and 341, the Higginses neither pleaded nor produced evidence of any interference with Lots 340 and 341 and because the Higginses neither pleaded nor produced any evidence of a real property interest in Camp Creek Lake.

We agree with CCWC that even though the Higginses produced evidence that they own the land comprised of Lots 340 and 341, and even though Mr. Higgins indicated in his affidavit that Mr. Crowell's boathouse caused the value of Lot 340 to depreciate, the Higginses neither pleaded nor produced evidence of any interference with the use and enjoyment of the specific land comprised of Lots 340 and 341. Instead, the Higginses pleaded and produced evidence only that Mr. Crowell's boathouse interferes with the Higginses' use and enjoyment of Camp Creek Lake.

But the Higginses produced no evidence that by owning Lots 340 and 341, or for any other reason, the Higginses own a real property interest in Camp Creek Lake.

Instead, viewing the summary-judgment evidence in the light most favorable to the Higginses, one could conclude only that CCWC owns Camp Creek Lake and that CCWC granted a license or licenses to the Higginses to use their existing boathouse on the lake and to use the lake generally. *See Thompson v. Clayton*, 346 S.W.3d 650, 655 (Tex. App.—El Paso 2009, no pet.) ("A license is defined as a privilege or authority given to one or retained by one to do some act or acts on the land of another, but which does not amount to an interest in the land itself.").

Our analysis, however, does not end there. As stated above, an occupancy interest in land is sufficient to vest a person with the right to assert a claim for private nuisance if the person occupied the land with intent to control it. *See Triolo*, 293 S.W.3d at 791; *New*, 1999 WL 675448, at *2–3. Thus, we must determine if the Higginses produced evidence that they occupied Camp Creek Lake with intent to control it. *See Triolo*, 293 S.W.3d at 791; *New*, 1999 WL 675448, at *2–3.

The Higginses produced evidence here that they own the existing boathouse for Lot 341. Both the "[CCWC] Building Permit Application" and the 2019 "Application for [CCWC] Annual Use Fee" require an applicant to acknowledge and agree that "any existing, or future structure(s) placed upon CCWC property is the personal/private property of the lot owner" and that "all taxes incurred on the structure(s) as well as up-keep, are the responsibility of the lot owner." Furthermore, we believe that evidence that the Higginses own the existing boathouse—a structure that continuously occupies a certain area of Camp Creek Lake—is some evidence that the Higginses intend to control that portion of the lake that the boathouse occupies. We therefore conclude that the

Higgins v. Crowell                                                                                          Page 21

Higginses produced evidence raising a genuine issue of material fact regarding whether they had a sufficient occupancy interest in that portion of Camp Creek Lake that the existing boathouse occupies. *See Triolo*, 293 S.W.3d at 791; *New*, 1999 WL 675448, at *2–3.

2.     *CCWC's Conduct*

We next address whether the Higginses produced evidence raising a genuine issue of material fact regarding the second element challenged by CCWC in the no-evidence portion of its motion for summary judgment—whether CCWC acted intentionally or negligently.

Whether a defendant acted intentionally is measured by a subjective standard. *Crosstex*, 505 S.W.3d at 605. A defendant intentionally causes a nuisance if the defendant acts with the desire to create the interference that constitutes the nuisance or acts with knowledge that the interference that constitutes the nuisance is substantially certain to result. *Id.* at 605–06.

Culpability under a negligent nuisance theory is governed by ordinary negligence principles. *Id.* at 607. "[T]he plaintiff must prove that the defendant's conduct constituted negligence, which is 'simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done.'" *Id.* (quoting *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998)).

Whether a defendant intentionally or negligently created the interference that constitutes the nuisance is generally a question of fact for the jury to decide. *Id.* at 609. "A court may decide the issues as a matter of law only if the underlying facts are undisputed or, in light of all the evidence, 'reasonable minds cannot differ.'" *Id.*

First, we believe that the summary-judgment evidence detailed above raised a genuine issue of material fact regarding whether CCWC acted intentionally. The Higginses produced some evidence that Mr. Crowell's boathouse was interfering with the use of the Higginses' own boathouse. The Higginses then produced evidence that Mr. Higgins informed CCWC's Board of Directors of the situation. The evidence indicates that Mr. Higgins apprised CCWC's Board of Directors that Mr. Crowell's boathouse had not been built in the location that the board had approved and that Mr. Crowell's boathouse was interfering with the use of the Higginses' boathouse. The Higginses then produced evidence that although CCWC's Board of Directors had the authority to require Mr. Crowell to move his boathouse or to remodel it in such a way that it no longer interfered with the use of the Higginses' boathouse, CCWC's Board of Directors voted to leave Mr. Crowell's boathouse in its current location. We accordingly conclude that the Higginses produced evidence that raised a genuine issue of material fact regarding whether CCWC acted with knowledge that the interference that constituted the nuisance in this case was substantially certain to result. *See id.* at 605–06.

We also believe that the Higginses produced evidence that raised a genuine issue of material fact regarding whether CCWC acted negligently. We concluded above that the Higginses produced evidence raising a genuine issue of material fact regarding whether they had a sufficient occupancy interest in that portion of Camp Creek Lake that their boathouse occupies. If the Higginses had a sufficient occupancy interest in the portion of Camp Creek Lake that their boathouse occupies, then CCWC owed the Higginses the duty to do what a person of ordinary prudence in the same or similar

circumstances would have done to prevent the use of CCWC's property, *i.e.*, the use of Camp Creek Lake, from causing injury or damage to the Higginses' rights to use their boathouse. *See id.* at 607, 614; *Ft. Worth & Rio Grande Ry. Co. v. Glenn*, 97 Tex. 586, 588, 80 S.W. 992, 993 (1904); *Triolo*, 293 S.W.3d at 790–91. The Higginses produced evidence that Mr. Higgins informed CCWC's Board of Directors that Mr. Crowell's boathouse had not been built in the location that the board had approved and that Mr. Crowell's boathouse was interfering with the use of the Higginses' boathouse by causing a safety hazard. The Higginses then produced evidence that although CCWC's Board of Directors had the authority to require Mr. Crowell to move his boathouse to the location that had been approved or to remodel it in such a way that it no longer interfered with the use of the Higginses' boathouse, CCWC's Board of Directors voted to leave Mr. Crowell's boathouse in its current location. The Higginses also produced evidence that members of CCWC's Board of Directors expressed concern that they were not being consistent in these types of situations. In another instance, CCWC's Board of Directors had required a lot owner to correct his boathouse roof when the lot owner had "not followed the rules." We accordingly conclude that the Higginses produced evidence that raised a genuine issue of material fact regarding whether CCWC did what a person of ordinary prudence in the same or similar circumstances would have done. *See Crosstex*, 505 S.W.3d at 607.

3. *The Higginses' Injury*

We finally turn to whether the Higginses produced evidence raising a genuine issue of material fact regarding the last element challenged by CCWC in the no-evidence

portion of its motion for summary judgment—whether CCWC proximately caused an injury to the Higginses.

To prove an action for private nuisance, the plaintiff must establish that the nuisance caused some injury. *Mathis v. Barnes*, 316 S.W.3d 795, 801 (Tex. App.—Tyler 2010), *rev'd on other grounds*, 353 S.W.3d 760 (Tex. 2011) (per curiam). A nuisance may cause two types of injury: (1) physical harm to the plaintiff's property, as by encroachment of a damaging substance or by the property's destruction, or (2) physical or emotional harm to the plaintiff. *Id.*; *see Crosstex*, 505 S.W.3d at 596. A nuisance that impairs comfortable enjoyment of real property may give rise to damages for personal discomfort and annoyance. *Mathis*, 316 S.W.3d at 801; *Cain v. Rust. Indus. Cleaning Servs., Inc.*, 969 S.W.2d 464, 470 (Tex. App.—Texarkana 1998, pet. denied), *overruled on other grounds by Env't Processing Sys., L.C. v. FPL Farming, Ltd.*, 457 S.W.3d 414 (Tex. 2015). A plaintiff is injured by a nuisance when the plaintiff suffers emotional harm from the deprivation of the enjoyment of his property, such as by fear, apprehension, offense, or loss of peace of mind. *Mathis*, 316 S.W.3d at 801; *Cain*, 969 S.W.2d at 470.

The Higginses' evidence specified how Mr. Crowell's boathouse interfered with the use and enjoyment of the Higginses' boat dock on Lot 341, and the summary-judgment evidence shows that Mr. Higgins told CCWC's Board of Directors about his concern about the safety hazard that Mr. Crowell's boathouse posed to his young grandchildren who use Mr. Higgins's boathouse to swim. Viewing the evidence in the light most favorable to the Higginses, we therefore conclude that the Higginses produced some evidence raising a genuine issue of material fact regarding whether Mr. Crowell's

boathouse caused Mr. Higgins to suffer emotional harm. *See Mathis*, 316 S.W.3d at 801; *Cain*, 969 S.W.2d at 470. The Higginses thus produced evidence raising a genuine issue of material fact regarding whether CCWC caused an injury to the Higginses. *See Mathis*, 316 S.W.3d at 801; *Cain*, 969 S.W.2d at 470.

Having concluded that the Higginses produced evidence raising a genuine issue of material fact as to each of the elements of their nonderivative claims that were challenged by CCWC in the no-evidence portion of CCWC's motion for summary judgment, we hold that the trial court erred in granting the no-evidence portion of CCWC's motion for summary judgment. *See* TEX. R. CIV. P. 166a(i).

TRADITIONAL SUMMARY JUDGMENT

Having held that the trial court erred in granting the no-evidence portion of CCWC's motion for summary judgment, we must consider the traditional portion of the motion. *See First United Pentecostal Church of Beaumont*, 514 S.W.3d at 219–20.

In reviewing a traditional motion for summary judgment, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). The movant carries the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam). The nonmovant has no burden to respond to a summary-judgment motion unless the movant conclusively establishes its cause of action or defense. *Willrich*, 28 S.W.3d at 23. However, once the movant produces sufficient evidence conclusively establishing its

right to summary judgment, the burden shifts to the nonmovant to present evidence sufficient to raise a fact issue. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). In reviewing a traditional summary judgment, we must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion. *See Mayes*, 236 S.W.3d at 756.

In the traditional portion of its motion for summary judgment, CCWC asserted that the pleadings and evidence conclusively establish that CCWC and the Crowells did not substantially interfere with the Higginses' use of their property because the Higginses' rights to use and enjoy Camp Creek Lake were those of only a contractual licensee. CCWC then produced evidence to support its contention that the Higginses' rights to use and enjoy Camp Creek Lake were those of only a contractual licensee. But, as explained above, an occupancy interest in the land is sufficient to vest a person with the right to assert a claim for private nuisance if the person occupied the land with intent to control it. *Triolo*, 293 S.W.3d at 791; *see New*, 1999 WL 675448, at *2–3. Accordingly, establishing that the Higginses's rights were those of contractual licensees is not enough to establish that CCWC is entitled to judgment as a matter of law. Furthermore, for the reasons explained above, we believe that there is a genuine issue of material fact regarding whether the Higginses had a sufficient occupancy interest in that portion of Camp Creek Lake that their existing boathouse occupies.

We therefore hold that the trial court erred in granting the traditional portion of CCWC's motion for summary judgment.  *See* TEX. R. CIV. P. 166a(c).  We thus sustain the Higginses' third issue.

**CCWC's Motion to Dismiss Under Business Organizations Code Section 21.558**

In their fourth issue, the Higginses contend that the trial court erred in dismissing their derivative claims against CCWC under Chapter 21 of the Business Organizations Code because of the complete lack of evidence supporting CCWC's motion.

Section 21.558 of the Business Organizations Code provides:

(a)   A court, sitting in equity as the finder of fact, shall dismiss a derivative proceeding on a motion by the corporation if the person or group of persons described by Section 21.554 determines in good faith, after conducting a reasonable inquiry and based on factors the person or group considers appropriate under the circumstances, that continuation of the derivative proceeding is not in the best interests of the corporation.

(b)   In determining whether the requirements of Subsection (a) have been met, the burden of proof shall be on:

(1)   the plaintiff shareholder if:

(A)   the majority of the board of directors consists of independent and disinterested directors at the time the determination is made;

(B)   the determination is made by a panel of one or more independent and disinterested persons appointed under Section 21.554(a)(3); or

(C)   the corporation presents prima facie evidence that demonstrates that the applicable person or persons making the determination under Section 21.554(a) are independent and disinterested; or

(2)   the corporation in any other circumstance.

TEX. BUS. ORGS. CODE ANN. § 21.558.

Here, CCWC filed an unsworn motion to dismiss under section 21.558, asserting that the independent and disinterested directors of CCWC's Board of Directors conducted a reasonable inquiry and concluded that the continuation of the derivative proceeding was not in the best interest of CCWC. In support of its motion, CCWC filed an unsworn "Notice of Determination by Board of Directors," signed only by CCWC's counsel. The Notice states that CCWC's Board of Directors, all of whom are independent and disinterested, completed its independent investigation of the claims asserted in the derivative proceeding, as authorized by section 21.554(a) of the Business Organizations Code. The Notice then explains that the scope of the investigation included:

1. Manual review of all of the documents related to the application and approval of the Crowell boat dock.

2. Manual review of the general procedures related to the application of any boat dock on Camp Creek Lake.

3. Review of the minutes of meetings related to the approval of the Crowell boat dock.

4. Review of the First Amended Pleading filed by Higgins asserting claims that the Board had not followed its procedures and had improperly approved the Crowell boat dock.

The Notice then provides that upon completion of its investigation, CCWC's Board of Directors determined that the factual allegations failed to support that the Board acted improperly in any manner related to the approval of the design, building, or location of the Crowell boat dock. The Notice states that CCWC's Board of Directors therefore recommended, based on its unanimous vote, that action not be pursued against the

directors and that the claims be dismissed as not being in the best interest of CCWC or its shareholders.

The Higginses argue that CCWC's "Notice of Determination by Board of Directors" is merely a pleading, not evidence, and that the trial court cannot dismiss a derivative proceeding under section 21.558 without any evidence. CCWC responds that because the trial court is sitting as a court of equity, the rules of evidence need not be strictly adhered to and that the trial court could make its determination based on the pleadings and the "Notice of Determination by Board of Directors."

Our task in interpreting statutes is to ascertain and to effectuate the Legislature's intent. *In re Canales*, 52 S.W.3d 698, 702 (Tex. 2001) (orig. proceeding). We begin with the statute's plain language because we assume that the Legislature tried to say what it meant. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865–66 (Tex. 1999). In ascertaining legislative intent, we do not confine our review to isolated statutory words, phrases, or clauses, but we instead examine the entire act. *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001).

Section 21.558 begins: "A court, sitting in equity as the *finder of fact* . . . ." TEX. BUS. ORGS. CODE ANN. § 21.558 (emphasis added). Section 21.556 of the Business Organizations Code further discusses discovery "[i]f a corporation proposes to dismiss a derivative proceeding under Section 21.558." *Id.* § 21.556. Based on the language of the statutes, we conclude that the Legislature did not intend for the trial court to dismiss a derivative proceeding under section 21.558 without evidence. Accordingly, we hold that

the trial court erred in dismissing the Higginses' derivative claims against CCWC under Chapter 21 of the Business Organizations Code. We sustain the Higginses' fourth issue.

## Conclusion

Having sustained each of the Higginses' issues, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.


MATT JOHNSON
Justice


Before Chief Justice Gray,
     Justice Johnson, and
     Justice Smith
Reversed and remanded
Opinion delivered and filed March 15, 2023
[CV06]

